**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 22 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

MARY ANGELA MORALES,

      Plaintiff-Appellant,

v.

McKESSON HEALTH SOLUTIONS,
LLC,

      Defendant-Appellee.

No. 04-1145
(D.C. No. 02-M-261 (BNB))
(D. Colo.)

---

**ORDER AND JUDGMENT** *

---

Before **LUCERO** , **McKAY** , and **PORFILIO** , Circuit Judges.

---

Mary Angela Morales brought an employment discrimination suit against
McKesson Health Solutions, LLC, claiming that McKesson violated Title VII,
42 U.S.C. §§ 2000e to 2000e-17, by discriminating against her based on her
religion.  The district court granted summary judgment to McKesson; Morales
appeals.  We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM.

---

*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

I

Morales, a Roman Catholic, was employed by McKesson from November 22, 1998, through December 24, 1999, as a telephone triage nurse. Patients call the triage service to receive a brief assessment of their symptoms for the purpose of determining the appropriate level and priority of medical treatment. McKesson requires its triage nurses to query the callers using a computer-based set of branching algorithms designed to sort patients into different risk categories. Nurses are required to proceed systematically through the algorithms to reach the appropriate level, timing, and provider of medical care, and may not make personal observations. The average call is to last nine minutes. When asked for medical information, the nurses are instructed to refer to items from a set list of approved information sources. McKesson has written policies against deviation from standard algorithm practices, inefficient work performance, insubordination, engaging in behavior which creates discord, and distributing printed materials on company time.

In disregard of McKesson's procedures and, we are told, occasionally instilling fear in McKesson patients, Morales injected Roman Catholic prayer and dogma into triage calls. She referred one patient, for example, to a priest for inquiry into whether his condition might be a "Eucharistic miracle." Her supervisors orally reprimanded her for such actions on December 3, 1999, and

reasserted their policy against discussions outside the bounds of the algorithms. McKesson further specified that if the callers themselves raised religious issues, as Morales asserted some had done, she was to refer them to their local spiritual leaders rather than imparting her personal religious viewpoint.

Morales, however, persisted in making religious comments that callers apparently found scary or offensive. She became embroiled in a dispute with one caller who "t[ook] the Lord's name in vain." R., vol. 1, doc. 52, Ex. M at 1. The caller was offended and terminated the encounter. She also recited the "Divine Mercy" prayer to a caller even though she acknowledges that it was "probably more than [she] should do." Doc. 52, Exhibit Y, 148:13-18, and later engaged in an hour-long call without entering any algorithm information, in violation of the algorithm procedure as well as McKesson's policies governing efficient work performance.

Morales also engaged in a series of harassing incidents involving co-workers, including telling one co-worker she was under attack by the "powers of darkness," and implying that another was Satan, or possessed by Satan (although she later testified that she was speaking to Satan in the email to her co-worker, rather than addressing the co-worker directly). Doc. 39, Exhibit J, 377:3-12.

McKesson prepared a written warning for Morales and presented it to her on December 23. The warning sought assurances from Morales that she would refrain from discussing religious beliefs or praying with callers, broaching religious discussions in the workplace without the invitation of another employee, distributing religious literature on company premises, and submitting forms requesting the inclusion of spiritual information in the algorithms. Morales declined to agree to the conditions specified in the warning. McKesson then terminated her employment.

Morales filed this religious discrimination suit alleging that she was discharged for her nonacceptance of McKesson's secularism. McKesson filed a motion for summary judgment, which the district court granted. Morales appealed.

II

Morales's appeal is governed by the summary judgment standard, requiring this court to review

> the district court's grant of summary judgment de novo, using the same standards applied by the district court. The evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party. Summary judgment is appropriate only where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Stover v. Martinez, 382 F.3d 1064, 1070 (10th Cir. 2004) (citations and internal quotation marks omitted).

Title VII prohibits an employer from discharging "any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). To prevail, a plaintiff must prove termination was based upon intentional discrimination. EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1191-92 (10th Cir. 2000). Where there is no direct evidence of discrimination, the court evaluates a summary judgment motion under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Horizon/CMS Healthcare Corp., 220 F.3d at 1191. Applying the McDonnell Douglas approach, a plaintiff must first establish a prima facie case of unlawful discrimination, so that the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. Id. If the employer produces such a reason, the burden returns to the plaintiff, who can avoid summary judgment by showing that the employer's proffered reason was merely a pretext for unlawful discrimination. Id.

Here, the appropriate prima facie case for plaintiff's discriminatory discharge claim requires a showing that: (1) plaintiff is a member of a protected class; (2) she was qualified to perform her job; (3) despite her qualifications, she was discharged; and (4) the job from which she was terminated was not

eliminated. <u>Perry v. Woodward</u>, 199 F.3d 1126, 1140 (10th Cir. 1999). For the purposes of our analysis, we assume that Morales's evidence meets this test. "Nothing in the case law in this circuit *requires* a plaintiff to compare herself to similarly-situated co-workers to satisfy the fourth element of her prima facie case." <u>Horizon/CMS Healthcare Corp.</u>, 220 F.3d at 1195. Thus, the district court erred in requiring Morales to demonstrate that similarly situated employees were treated differently.

Nevertheless, this error does not affect the validity of the district court's entry of summary judgment. As an alternative basis for its ruling, the district court proceeded to the second step of the <u>McDonnell Douglas</u> analysis. It properly determined that McKesson had articulated legitimate reasons for terminating Ms. Morales's employment and Morales had failed to demonstrate pretext. "To show pretext, the plaintiff must call into question the honesty or good faith" of the employer's assessment of the situation. <u>Exum v. United States Olympic Comm.</u>, 389 F.3d 1130, 1137 (10th Cir. 2004).

Pretext may be demonstrated by revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." <u>Morgan v. Hilti, Inc.</u>, 108

F.3d 1319, 1323 (10th Cir. 1997). In Morales's case, in contrast, she testified that neither her boss, nor "any of the other supervisors" were anti-Catholic, alleging only a generalized institutional secularism. Doc. 52, Exhibit Y 125:6-14. She furthermore does not deny having engaged in the harassing and rule-violating conduct that form the basis of her dismissal.

On our review of the record, we agree with the district court that Morales's repeated straying from the algorithms and disruptions of workplace harmony were violations of McKesson's workplace policies, and constitute valid, nondiscriminatory reasons for terminating her employment – reasons that Morales has not shown to be pretextual under the standards of Exum or Morgan.

Under Title VII, an employer is required reasonably to accommodate an employee's religious practices or beliefs where accommodation does not cause undue hardship to the company's business interests. Shapolia v. Los Alamos Nat'l Lab., 992 F.2d 1033, 1037 (10th Cir. 1993). However, a religious accommodation claim is distinct from a "straightforward disparate treatment" claim. Id. In the instant case, Morales claims that she was fired because she did not hold the same religious beliefs as her supervisors. Morales's counsel did not raise the accommodation issue below and we will not reach it here. See United States v. Chavez-Marquez, 66 F.3d 259, 261 (10th Cir. 1995) (stating that we do not consider issues which are raised for the first time on appeal except to review

-7-

for plain error resulting in manifest injustice).  As in     Shapolia , "[t]he question for the trier of fact is straightforward," whether Morales's termination was motivated by an animus directed against non-secular employees.     Id.  We cannot conclude that it was.

The judgment of the district court is AFFIRMED.     [1]

                                        Entered for the Court


                                        Carlos F. Lucero
                                        Circuit Judge

_____

[1] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal.   See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.